OPINION OF THE COURT
B. Thomas Pantano, J.
This is an action by the plaintiff to have declared invalid a certain zoning resolution adopted by the Town of Oyster Bay on January 15, 1980 and tried by the court without a jury on September 3, 4, 5, 8, 9 and 15, 1980.
The plaintiffs in this action consist of certain individuals as well as a civic council and civic association. The civic council is comprised of the various civic associations *377 named as plaintiff and contain approximately 870 homeowners. These plaintiffs generally reside in the Glen Head-Glenwood Landing area within the Town of Oyster Bay. The individual plaintiffs named are generally residents of the Incorporated Village of Old Brookville. Named as defendants are the Town of Oyster Bay, the town supervisor and councilmen constituting the Town Board of the Town of Oyster Bay, the Glen Head Country Club, Inc., the owner of the subject property, and Alvin Benjamin, the petitioner and contract vendee.
The property in question is on the southern extremity of the golf club, is located on the west side of Cedar Swamp Road, south of the City of Glen Cove and is wholly within the Town of Oyster Bay. Cedar Swamp Road runs generally north and south in this area and on the east side of said road there is located property which lies within the limits of the Village of Old Brookville. On or about May 14, 1976 some three months after an application on this same property for multiple residence had been rejected by the Town of Oyster Bay, the defendant contract vendee offered to purchase this property from the golf club with a provision which stated in effect that the contract was conditioned upon the vendee being able to secure a down zoning to apartment house zone. The property consists of 21.57 acres and the purchase price was $1,250,000 if not more than 126 dwelling units were permitted, and an additional sum of $4,470 for each additional unit permitted above 126 up to a maximum of 210 residential units.
On or about September 13, 1977 the contract vendee, defendant Benjamin, filed an application with the town for a rezoning as contemplated by the contract.
On June 5, 1978 Benjamin was advised by the Town of Oyster Bay, Division of Environmental Control, that a review of his petition for a rezoning indicated that the proposal may have a significant impact on the environment and that the preparation of a draft environmental impact statement was necessary.
The plaintiff Glen Head-Glenwood Landing Civic Council, Inc. had been very active in prior applications for rezonings and as a matter of fact was involved in the *378 February, 1976 hearing which resulted in a rejection of the application for apartment house zone for this property. As is evidenced by the testimony and the exhibits introduced the Supervisor of the Town of Oyster Bay as well as his administrative assistant were keenly aware of the civic council’s interest in this subject property to the extent that the supervisor and his assistant had met with the president of the council, Mrs. Swing, and had assured her that she would be kept advised of all of the developments including when, as and if a petition were called for a public hearing on a rezoning on this acreage. At its meeting of June 12, 1979 the town board directed the town clerk to publish and post the resolution calling for a public hearing on this application for rezoning for July 10,1979. Notice of this hearing was mailed on or about June 25, 1979.
Plaintiffs contend that there has been a failure on the part of the defendants to comply with the provisions of ECL article 8, that the town board’s resolution should be annulled for failure to conduct an appropriate hearing within the requirements of section 264 of the Town Law, that the town violated the Open Meetings Law (Public Officers Law, § 95 et seq.), that the applicant failed to comply with the provisions of section 42 of the building zone ordinance requiring disclosure, and that the change in zoning adopted by the town board was spot zoning and violated the comprehensive plan of the town and further that there were various procedural defects which would warrant the annulment of the zoning resolution in question. Defendants generally contend that the plaintiffs have no standing to maintain this action, that the zoning was proper and did not constitute spot zoning and that the defendants complied in all respects with the State Environmental Conservation Law as well as the requirements of the Town of Oyster Bay.
Before proceeding with the major contentions of the plaintiff, the court feels it best to dispose of the contention raised by the defendants that the plaintiff lacks standing to sue. The courts of this State have been very liberal in their approach to the issue of “standing”. The excellent reasons for the liberalized approach may be found in the case of Matter of Douglaston Civic Assn. v Galvin (36 NY2d *379 1). A reading of that case will emphasize the philosophy behind this attitude of liberalization. In a case in which the impact of rezoning as well as the environmental impact was considered the court found that a taxpayers’ association and residents living within a radius of 100 to 1,500 feet from the subject area had the required standing to contest the validity of a zoning change. (Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd. of Town of Tuxedo, 96 Misc 2d 1, affd 69 AD2d 320.) In the case before the court there is no reason to find that the individual plaintiffs, who reside in a separate municipality, do not have equal standing with plaintiffs who reside within the limits of the Town of Oyster Bay since the individual plaintiffs reside within a radius where they may be adversely affected, inter alia, in such matters as noise, water, air pollution and traffic density. The court finds that the plaintiffs, therefore, have standing to bring this action.
Proceeding now to the plaintiffs’ contention that there was a failure on the part of defendants to comply with the provisions of ECL article 8 it appears from the evidence that subsequent to the filing of Benjamin’s petition for a rezoning the town acting through its town Environmental Quality Review Commission advised the applicant that the commission had determined that the application may have a significant impact on the environment and that the preparation of a draft environmental impact statement was necessary. The commission outlined those components of the proposed project which were of concern to the commission as follows:
“1. Glen Cove Creek, a tributary into Hempstead Harbor, runs through the subject property. Two ponds are proposed which would intercept the creek. Also, surface drainage from the proposed development may enter the creek. Environmental impact and mitigation measures involving Glen Cove Creek and the proposed ponds, both during and after construction need to be outlined.
“2. On site disposal of domestic sewerage may have an additional impact on Glen Cove Creek and/or local ground water conditions. Therefore, comments will be solicited from the Nassau County Health Department, regarding any potential sewerage disposal problem. Preliminary *380 sewerage disposal plans are hereby requested from the applicant to assist the health department in their preliminary assessment.”
It was agreed that where the reference was to Glen Cove Creek the commission was also speaking of Cedar Swamp Creek which ran through the property and ultimately joined Glen Cove Creek finally emptying into Hempstead Harbor.
The necessity for filing an environmental impact statement (hereinafter referred to as EIS) and the procedures involved find their substance in the Environmental Conservation Law of the State of New York and the regulations promulgated thereunder.
The legislative purposes in adopting the act are clearly announced in the act itself and follow and are fashioned upon the Federal National Environmental Policy Act, generally known as “NEPA” adopted by the Federal Government effective January 1, 1970 (US Code, tit 42, § 4321 et seq.) and since followed by the adoption of similar acts in some 15 States including New York.
Among other things in setting forth the purposes of enactment, the Legislature stated it was to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources and to undertake to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the State; the maintenance of a quality environment that is healthful now and in the future is a matter of State-wide concern, every citizen has a responsibility to contribute to the preservation and enhancement of the quality of the environment, the capacity of the environment is limited and the government must take immediate steps to identify critical thresholds and take co-ordinated action to prevent such thresholds from being reached.
As further implementation, subdivisions 8 and 9 of ECL 8-0103 provide as follows:
“8. It is the intent of the legislature that all agencies conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations.
*381 “9. It is the intent of the legislature that all agencies which regulate activities of individuals, corporations, and public agencies which are found to affect the quality of the environment shall regulate such activities so that due consideration is given to preventing environmental damage.”
In order to carry out the intent of the Legislature as outlined above provisions were made for the procurement of environmental impact statements. In ECL 8-0109 (subd 2) the Legislature stated in part: “The purpose of an environmental impact statement is to provide detailed information about the effect which a proposed action is likely to have on the environment, to list ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form the basis for a decision whether or not to undertake or approve such action. Such statement should be clearly written in a concise manner capable of being read and understood by the public”.
The act then provides for the filing of the draft environmental statement with the appropriate designated agency or department so that it may be circulated to Federal, State, regional and local agencies having an interest in the proposed action and to interested members of the public for comment. In subdivision 6 of the afore-mentioned section it is provided that the environmental impact statement shall be filed with the comments of public and Federal agencies as well as members of the public and in addition will be made available to the public prior to acting on the proposal which is the subject of the environmental impact statement. Subdivision 8 of the afore-mentioned section provides as follows: “When an agency decides to carry out or approve an action which has been the subject of an environmental impact statement, it shall make an explicit finding that the requirements of this section have been met”.
Under the State rules and regulations adopted pursuant to the statute appearing in 6 NYCRR 617.1 et seq. the legislative intent is further set forth as well as procedures for the designation of a lead agency, the filing of the preliminary or draft EIS and the final EIS and circulariza *382 tion thereof among all interested agencies and members of the interested public.
As defined a lead agency is the agency which assumes the responsibility for carrying out whether or not an EIS is required.
Various types of action are described, the word “action” meaning any act which has an effect on the environment as therein defined. The “action” in this particular case was designated as a type 1 action involving the requirement as set forth by the town to the builder applicant for filing an EIS under the act. The town was the lead agency in this case. Again under these rules it is apparent from reading that it was the intent of the commissioner in promulgating them that the public be granted an opportunity to take an active part in the hearings and to comment upon the process of the environmental quality review. In connection with these rules which are found under Part 617 they are entitled State Environmental Quality Review, promulgated under ECL 8-0113, and frequently referred to as SEQR. Section 617.9 (c) (3) of title 6 of the Official Compilation of Codes, Rules and Regulations, entitled Decision-making and findings requirements, provides in part as follows: “No agency, whether lead agency or not, shall make a final decision to commence, engage in, fund or approve an action that has been the subject of a final Federal or final SEQR EIS until it has: * * * (3) prepared a written statement of the facts and conclusions relied upon in the EIS, supporting its decision and indicating the social, economic and other factors and standards which formed the basis of its decision.”
The record indicates that beginning in July of 1978 the draft EIS was being worked upon and being submitted at various stages to the Town of Oyster Bay. The town in turn had notified the Nassau County Planning Commission of the application for rezoning as well as the Nassau County Department of Health. During this period of time a concern was shown with disposal of sewerage as well as waste water as is evidenced by correspondence from the Nassau County Planning Commission to the Town of Oyster Bay and the Town of Oyster Bay’s letter to the developer’s planning expert outlining these problems. The draft EIS *383 apparently was in process and the subject of exchanges between the town and the developer from that period up until June 15, 1979 when there was filed a notice of completion of a final environmental impact statement. No copy of this notice or of the final environmental impact statement was received by the plaintiff civic association council until on or about sometime between July 2, 1979 when the final environmental impact statement was mailed by the Town of Oyster Bay and July 10,1979 which was the date of the public hearing on the application for the rezoning. It is interesting to note that as early as August of 1978 the defendant town and more particularly its supervisor were well aware of the interest that was had in this property by the plaintiff Glen Head-Glenwood Landing Civic Council. Bearing in mind that the town was apprised of the interest that the citizenry had in this application and the fact that the environmental impact statement was already being worked on between the developer and the town, it is difficult to understand why this information was not submitted to the civic council in order to enable them to contribute their input into the environmental aspect of this application as contemplated by ECL 8-0109. In discussing the role of the public in this application the court is referring to the public as those individuals and associations comprising the plaintiffs in this action. From the foregoing it is apparent that the public was deprived of any, but an other than limited, opportunity to contribute its thoughts and submit its proof with respect to the environmental impact that this action would have upon the property and the area surrounding it.
The area of greatest impact appears from the record to be that of sewerage waste disposal. While the environmental impact statement has provisions for various methods of disposal all of which were commented upon at the trial of the action it is apparent that none of the agencies such as the State of New York Department of Environmental Conservation, the Nassau County Planning Commission and the Nassau County Department of Health were ever called upon to submit their comments on these proposals. The reason for this was that at the time of the submission of the environmental impact statement, alternate number *384 3 on page 959 indicated that the City of Glen Cove would permit the developer to connect to and utilize its new sewerage treatment facilities. Additionally at the public hearing on July 19 Mr. Benjamin’s counsel stated: “With respect to environmental concerns the City of Glen Cove has given us a letter indicating that when their plant is completed, which is expected in 1980, we will be permitted to tap into their sewer facility.”
Having satisfied the town board with that statement and also with an acceptable design for the removal of surface waters without an interference into and with the waters of Cedar Swamp Creek the town board reserved decision on the application. With respect to the use of the Glen Cove sewer system it might be well to review the events that led up to the developer advising the town board that they had received approval to use that sewer system. On September 12, 1978 the Commissioner of Public Works of the City of Glen Cove advising the developer’s planner stated that the request to use the Glen Cove sewer system would have to be denied. Subsequently on April 12, 1979 again by letter from the Commissioner of Public Works to the developer’s planner, approval was given for a hookup to the Glen Cove sewer plant when completed outlining certain conditions thereto which apparently the developer was willing to meet. After the public hearing Mrs. Swing, the president of the civic council, pursued the matter further and notified the Supervisor of the Town of Oyster Bay that in a conversation she had with the office of the Mayor of Glen Cove she had been advised that the City Council of the City of Glen Cove had not given approval for such a proposal and that the present council would not even be considering the matter. That statement was subsequently confirmed by a letter of November 30, 1979 written to Mrs. Swing in which the Mayor indicated that any such action would have to be approved by the Glen Cove City Council and that would not be acted upon until the new administration took office on January 1,1980. A copy of that letter as well as a copy of Mrs. Swing’s letter was forwarded to the Supervisor of Oyster Bay on November 30, 1979. Also on November 30, 1979 Mrs. Swing wrote a letter to the New York State Department of Environmental Conservation *385 with respect to this particular issue addressed to the attention of a Mr. David Deritter. Mr. Deritter responded on January 7, 1980. That letter is dated January 7, 1980 and in pertinent part provides that ground water discharged through septic systems would contravene State ground water standards and would not be considered an acceptable alternative, and also that an on-site sewerage treatment plant with tertiary treatment and discharge to Cedar Swamp Creek while another option would be costly and also might not be acceptable environmentally. That type of an alternate would also require a filing for a State pollutant discharge elimination system and would require further environmental review and the preparation of another EIS. Mr. Deritter also pointed out that the project as proposed required a filing for a State freshwater wetlands permit.
On January 9, 1980 the Glen Head-Glenwood Landing Civic Council communicated by letter the information contained in Mr. Deritter’s letter and hand delivered seven copies to the administrative assistant for the supervisor of the town. At its meeting of January 15, 1980 the Town Board of the Town of Oyster Bay approved the application for the rezoning as submitted subject to voluntary covenants and restrictions imposed upon the subject premises by the applicants the owners in fee.
As a consequence the vital issue of the sewerage was passed over as having been fully satisfied and the attention of the concerned agencies having been diverted elsewhere the matter was not given further consideration.
In reviewing the evidence and the testimony it is apparent to the court that the Town of Oyster Bay as the lead agency failed not only to comply with the spirit of the Environmental Conservation Law but also with the, letter of that law as well as the rules adopted under 6 NYCRR Part 617 entitled State Environmental Quality Review. In failing to provide adequate notice and opportunity to review both the draft EIS and the final EIS by members of the public, the town was remiss in their stewardship of air, water, land and living resources and their obligation to protect the environment for the use of this and future generations. Specifically the court finds that the town has *386 failed to comply with ECL 8-0109 (subd 8) and 6 NYCRR 617.9 which statute and rules require the town to prepare a written statement of the facts and conclusions relied upon in the EIS supporting its decision and indicating the social, economic and other factors and standards which form the basis of its decision. Nor has the town been able to explain why six days after having received a letter from the State Department of Environmental Conservation dealing with the issue of sewerage waste disposal they proceeded to completely ignore this and on January 15, 1980 grant the approval of the rezoning. The importance of compliance with the statute and the rules promulgated thereon is not only for the protection and preservation of the precious heritage of our environment but also to enable the courts to make judicial inquiry as to compliance therewith.
This was pointed out in a case decided under the Federal statute in 1973 (Silva v Lynn, 482 F2d 1282, 1283) where the court stated that its function involved a judicial inquiry as to whether the agency’s findings and conclusions in the EIS were arbitrary, capricious and an abuse of discretion or otherwise not in accordance with the law and whether the agency followed the procedures required by law. In dealing with the requirement that the agencies are mandated to explain their resolution of the environmental problems the court said (supra, at pp 1284-1285): “serves at least three purposes. First, it permits the courts to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must ‘explicate fully its course of inquiry, its analysis and its reasoning.’ *** Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project. *** Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. * * * Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these *387 comments may not simply be ignored. There must be good faith, reasoned analysis in response.”
In dealing with the environment and the New York State law and rule the court is constrained to look to the Federal courts for guidance since our State’s statutes and rules parallel so closely those of our Federal Government. In reviewing the resolution of the town board in adopting the rezoning there have been no findings and determinations made which would indicate an informed and concerned judgment.
In concluding that there has neither been compliance by the town and the applicant with the specific terms of the State Environmental Quality Review Act nor with its spirit and intent, the determination arrived at based on the proceedings as they were had is annulled and set aside.
The plaintiff also seeks to set aside the resolution on the ground that the town board failed to conduct an appropriate hearing within the requirements of section 264 of the Town Law. This contention is based upon the fact that it was not until after the public hearing was concluded that the plaintiff discovered that the problem of sewerage disposal had not been solved since there was no firm commitment from the City of Glen Cove that would permit the developer to tie into the city sewer system. In dealing with this issue the court must consider the circumstances as they existed at the time of the hearing.
The statute is silent as to the precise nature of a hearing. However, its purpose is to afford affected landowners an opportunity to advise the legislative body of the probable effect which the proposed measure will have on his and other lands. (67 NY Jur, Zoning and Planning Laws, § 48.) In the case at bar it is obvious that everyone was given a fair opportunity to be heard at this proceeding. The question remains whether or not the fact that evidence was brought to light after the conclusion of the hearing and prior to the decision which is of a vital nature had the effect of rendering the hearing null and void. This court does not think or find that the newly disclosed evidence negated the proceedings that took place at the public hearing. The hearing was conducted in accordance with the requirements of section 264 and everyone was given an ample *388 opportunity to be heard. While the fact that the newly discovered evidence could well have precipitated an additional hearing upon the board’s own motion or might form the basis, as in this case, of an attack on the decision of the board in granting the resolution it cannot affect the propriety of the hearing as conducted.
After the matter of the City of Glen Cove’s rejection of a tie in with its sewer system was brought to the attention of the Supervisor of the Town of Oyster Bay the matter was referred to the Town Attorney apparently for investigation. The Town Attorney investigated the matter and responded to the communication that the supervisor had received from the civic association on November 28, 1980 to the effect that they had been in communication with the applicant and that there was more than one alternative for sewerage disposal. It is the plaintiff’s contention that this action was taken in violation of article 7 of the Public Officers Law providing for open meetings.
In order to determine whether there is any merit to the plaintiff’s contention it is necessary to refer to section 97 of the Public Officers Law providing for definitions. That section provides in part as follows:
“As used in this article: 1. ‘Meeting’ means the official convening of a public body for the purpose of conducting public business.
“2. ‘Public body’ means any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law, or committee or subcommittee or other similar body of such public body.”
In dealing with subdivisions 1 and 2 of section 97, and the phrases of limitation in the statute, the Appellate Division, Second Department, in the case of Matter of Orange County Pub., Div. of Ottaway Newspapers v Council of City of Newburgh (60 AD2d 409, 416), said: “The clear implication then of these phrases of limitation, in the light of the other requirements of the Open Meetings Law, is that they connote a gathering, by a quorum, on notice, at a *389 designated time and place, where public business is not only voted upon but also discussed. These meetings, regardless of how denominated, come within the tenor and spirit of the Open Meetings Law and should be open to the public.”
In the case before the court there is no testimony whatsoever that would bring the action of the Town Attorney, in performing what amounted to a slight investigative procedure, under the provisions of the Open Meetings Law. As a matter of fact no new evidence was developed, for all that transpired was that the applicant advised the Town Attorney that the matter was already covered in the environmental impact statement which was part of the record. For the reasons noted we find the plaintiff’s objections on this ground without merit.
Plaintiffs also contend that the rezoning should be set aside on the ground that the applicant failed to comply with the provisions of section 42 of the Building Zone Ordinance of the Town of Oyster Bay and by section 809 of the General Municipal Law.
The petition for rezoning was filed on March 3,1978 and affidavits of the parties as required by section 42 were received by the town on March 15, 1978. They contained the affidavits of Benjamin, his partner, Mr. Berlin, as well as the affidavit of an officer of the contract vendor, the Glen Head Country Club.
Some nine months later Berlin sold his 50% interest in the subject premises to one Louis Feil. No affidavit in conformity with section 42 of the building zone ordinance was filed on his behalf until the time of the trial. While it is true that the section referred to requires the filing of an affidavit within 48 hours of the happening of the change it also refers to all changes taking place prior to the issuance of a certificate of occupancy. It appears to the court that since changes may take place up until the time of the issuance of occupancy the failure on the part of the defendant Benjamin and Louis Feil to make the required disclosure is not fatal to the application in itself.
The main and primary interest of section 42 of the building zone code as well as the conflict of interest article *390 adopted by the Town of Oyster Bay as a local law were because of a known increasing need for standards of ethical conduct as a guide for public officers and for the protection of the community as a whole. On the basis of the evidence presented in the case the court finds that the failure by Louis Feil to file the required affidavit within 48 hours of the change is not fatal to the proceeding. (Cf. 1974 Atty Gen [Inf Opns] 106.)
While the court has already determined that the rezoning was void by reason of the town’s failure to comply with the State Environmental Quality Review Act as well as the rules and regulations adopted thereunder, the court will briefly discuss the plaintiffs’ contention that the change in zoning adopted by the town board violated the pre-existing comprehensive plan of the town.
Part of the evidence presented to the Town of Oyster Bay in connection with the petition for rezoning was the environmental impact statement. That statement discussed the housing needs of the Town of Oyster Bay as well as the growing segments of the various age groups within the town. It pointed out that these groups will create a demand for apartment units and that apartments were at a minimum within the town as well as the county. The EIS further pointed out that there was a large market for luxury condominiums and that these were usually sought after by middle-aged groups ranging in age from 40 years on up. The evidence also pointed out the fact that the tax benefits to school districts resulting from luxury condominium development would be greater than that if the property were used for development of one-family homes.
Under the Town of Oyster Bay E2 Cluster Ordinance adopted in 1973 the homes are allowed to be attached, thereby permitting front, rear and side yards to be increased abutting adjacent areas and decreased on interior portions. In this zoning, buildings are placed in regard to environmental, economic and typographic factors. It also provides for greater open spaces for recreational and aesthetic purposes. Finally it was established that in approving the change of zone the town board required the developer to file a declaration of restrictive covenants which among other things limited the developer to 112 condomin *391 ium units which was substantially less than what might otherwise be permitted under the density allowed in the E2 zoning classification. This proposed density was equivalent to 5.2 units per acre which is similar to the density of six dwellings per acre as permitted in a D zoning district which zone is part of the subject property as well as the adjoining properties to the south and southwest.
While the Town of Oyster Bay has no “comprehensive plan” as such a review of the development of the town, its zoning ordinances as well as recommendations from planning experts hired by the town clearly establishes that the zoning is in accordance with a comprehensive plan. Stated another way the zoning ordinances of a town do not constitute a comprehensive plan but rather it is the adoption of the ordinance done in accordance with a comprehensive plan to which the courts will look.
The fact that property has been in a particular zone for long periods of time does not render it inviolate to a change in zone. The leading case discussing the issue of comprehensive planning and spot zoning is Rodgers v Village of Tarrytown (302 NY 115). There the court stated (supra, at p 121): “While stability and regularity are undoubtedly essential to the operation of zoning plans, zoning is by no means static. Changed or changing conditions call for changed plans, and persons who own property in a particular zone or use district enjoy no eternally vested right to that classification if the public interest demands otherwise.”
In order to sustain their position the plaintiffs must show that the rezoning ordinance was arbitrary, unreasonable or that the legislative body was capricious in its adoption. In the case before the court the plaintiffs have failed to sustain the burden that the rezoning ordinance is not justified under the police power of the State by any reasonable interpretation of the facts. At best the validity of the legislative classification for zoning purposes could be fairly debatable. However, even in that event the legislative judgments 'must be allowed to control. (Shepard v Village of Skaneateles, 300 NY 115.)
In their final point to have the zoning ordinance declared null and void the plaintiffs contend multiple grounds as follows:
*392 (A) The EIS failed to address itself to the SEQR specific provisions concerning matters of historical or aesthetic significance.
(B) That a wetlands permit was a condition precedent to the approval of the application and that no permit had been issued.
(C) Rezoning should be annulled since it was basically for the benefit of the country club and the builder.
(D) There was an unlawful delegation to outside and uncontrolled governmental bodies and agencies; and
(E) That other procedural defects existed which cumulatively coupled with all other matters in this record require the annulment of the proceedings.
Since the town board failed to comply with the statute and rules with respect to the findings that it is required to make in an action of this type the court cannot determine whether or not the criteria enumerated in 6 NYCRR 617.11 (a) (5) requiring an examination of the significant effect of the historical, archaeological, agricultural or aesthetic resources were given the consideration required. With respect to the existence of a wetlands permit the town’s environmental witness testified that a wetlands permit was a requirement, that the applicant was notified of that and that a wetlands permit was filed and received. Furthermore, the witness testified that the environmental impact statement would not have been passed had not such a permit been issued. In direct contrast to the foregoing the witness for the New York State Department of Environmental Conservation testified that they had never received an application for a wetlands permit. No evidence or testimony explaining this inconsistency was ever offered by the defendants. In light of this testimony it is difficult to understand how the final environmental impact statement could have been approved and the resolution rezoning the property adopted.
Plaintiffs make the further argument that the resolution should be annulled since it was adopted basically for the benefit of the country club and the builder. This type of argument flies in the face of all reasoning and logic with respect to zoning.
*393 It is the cardinal principle that property should be zoned for its highest and best use. If that be the fact then every zoning which provides for the highest and best use of property necessarily benefits the owner or prospective purchaser. If the plaintiff’s contention were correct property could never be rezoned if it incidentally benefited the parties seeking the rezoning.
Without discussing in detail the final two points raised by the plaintiff the court finds there was no unlawful delegation of duties to any outside municipalities, nor are there procedural defects which the plaintiffs have outlined on page 112 of their posttrial memorandum of such great significance that they must be discussed further, especially in light of the determination arrived at by the court as set forth herein.
Judgment accordingly is granted to the plaintiff to the extent that Resolution No. 47-80 adopted by the Town Board of the Town of Oyster Bay on January 15, 1980 is hereby annulled and set aside.